Filed 6/17/26  P. v. Ferncase CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084914 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN447507) |
| PATRICK JAMES FERNCASE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego, Daniel Link, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Senior Assistant Attorney General, Eric A. Swenson, Supervising Deputy Attorney General and Heather B. Arambarri, Deputy Attorney General for Plaintiff and Respondent.

A jury convicted Patrick James Ferncase of the December 2021 first degree murder of Aureo Duque Rayo (Pen. Code,[1] § 187, subd. (a); count 1) and the March 2022 first degree murder of Derek Baker (count 2). It found true special circumstance allegations that Ferncase was convicted of more than one first or second degree murder offense in the present proceeding (§ 190.2, subd. (a)(3)).[2] Ferncase admitted he had suffered a 2015 conviction for violating sections 245, subdivision (a)(4) and 12022.7, subdivision (b) that constituted both a prior serious felony conviction (§ 667, subd (a)) and a prior strike (§§ 667, subds. (b)-(i), 1170.12). He also admitted factors in aggravation under California Rules of Court, rules 4.421(a)(1) [offense involved great violence or bodily harm], 4.421(a)(3) [the victim was particularly vulnerable], 4.421(b)(2) [numerous prior convictions of increasing seriousness], 4.421(b)(3) [prior state and local prison term] and 4.421(b)(5) [prior unsatisfactory performance on probation]. The court sentenced Ferncase to a 10-year determinate term plus two consecutive terms of life without the possibility of parole. It imposed a $300 parole revocation restitution fine under section 1202.45.

Ferncase contends the trial court prejudicially erred by failing to sever his murder charges for trial, as the offenses took place on different dates, at different places, and under different circumstances. He also contends that by permitting the prosecution to admit into evidence under Evidence Code sections 1101 and 1103 prior assaults he had committed, the court violated his rights to due process and a fair trial. Ferncase asks this court to strike his section 1202.45 parole revocation restitution fine, claiming the fine is

---

[1] Undesignated statutory references are to the Penal Code.

[2] The trial court dismissed the special allegation as to count 2.

inapplicable to his life-without-the-possibility-of-parole sentence.  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*December 2021 Murder of Aureo Duque Rayo*

On the morning of December 22, 2021, Ferncase approached Rayo, who was working his maintenance job at a shopping center in Carlsbad.  Ferncase knocked Rayo to the ground, then kicked and punched him in the head and upper torso.  Surveillance video showed Ferncase stomped on Rayo 32 times over the course of a minute; witnesses described him as kicking "viciously."  The video did not show any prior interactions between Ferncase and Rayo or that they had exchanged any words before Ferncase knocked Rayo to the ground.  A witness saw Ferncase "stomping" on Rayo's lifeless body, screamed at him to stop, and called 911.  She followed Ferncase in her vehicle until police arrived and arrested him.

Police interviewed Ferncase after his arrest.  Ferncase told a detective that Rayo, who he estimated to be 50 to 60 years old, "was talking shit," and calling him a "white boy" so he "hit [Rayo] in the mouth, stomped him out, [and] killed him."  Ferncase told the officer, "He's not going to live.  Put twenty dollars on that.  He ain't going to make it."  Ferncase referred to Rayo as "Mexican" but explained he hit Rayo because he was "talking shit."

Rayo suffered fractures to his skull and eyes, as well as brain injury. He never regained consciousness, and died four months later from the blunt force injuries to his head.

*March 2022 Murder of Derek Baker*

On March 12, 2022, Ferncase was in the San Diego Central Jail sharing a cell with Derek Baker, a 56-year-old man with diabetes.  Two inmates were housed in an adjacent cell.  That day, the neighboring inmates

3

heard the distinct sound of the intercom button in the next door cell being pressed, followed by banging, grunting and the sounds of flesh impacting other flesh like a punch or physical fight. The inmates heard the intercom again and then heard a person say, "Man down." One of the inmates identified the voice as Ferncase's. Neither inmate heard Ferncase and Baker argue or exchange words before hearing the sounds of assault.

Eventually, deputies responded to the scene. They found Baker unconscious, lying on the floor in a pool of blood. Baker was bleeding from his head and his face was so swollen he was unrecognizable.

While being escorted out of the cell, Ferncase related that he "stomped [Baker] out, out of anger" saying "I was white and . . . he was Hispanic and I had to do what I had to do, or you know how it goes." During a later interview with detectives,[3] Ferncase claimed Baker started the altercation by calling him names such as "bitch," which were "fighting words." Ferncase admitted to throwing the first punch, however, knocking Baker out on the second hit. According to Ferncase, Baker woke up and the men ended up on the floor where Baker tried to bite Ferncase's genitals, but Ferncase choked him unconscious then "stomped him out." Ferncase estimated he stomped Baker's head about 25 times, and believed he either killed or paralyzed him. Ferncase agreed he acted in the way he did essentially because Baker was Mexican, and things in jail were race-oriented, so he had to "finish that out."

Baker suffered facial fractures and severe traumatic brain injury. He died later in March 2022 as a result of the blunt force injuries to his head. His death was ruled a homicide. Ferncase's only injuries were a very swollen right hand/ knuckles and a scratch on his left forearm. An investigating

---

[3]   The People played Ferncase's interview at trial and gave transcripts to jurors.

detective did not find, and Ferncase did not complain about, injuries to his genitals.

*Defense Evidence*

In his defense, Ferncase presented evidence that in December 2020 while at a correctional facility, a cellmate assaulted him, rendering him unconscious and leaving him with facial fractures and bleeding from his scalp. Ferncase also presented evidence about Baker, his prior arrests and aggressive behavior, as well as his medical and mental health diagnoses. The parties stipulated that Baker had pleaded guilty to sex crimes against women committed in 1984 and 1986.

DISCUSSION

I. *Severance of Murder Charges*

Pointing out the charged crimes took place on different dates, at different places, and under different circumstances with different witnesses, Ferncase contends the trial court abused its discretion in denying his motion to sever the two murder counts. He maintains the facts of each case were too dissimilar to be cross-admissible, and the jury was unduly prejudiced by the inflammatory nature of Rayo's murder, which was a stronger case. Ferncase argues the error rendered his trial fundamentally unfair in violation of his right to due process of law.

A. *Background*

Before trial, Ferncase moved to sever the two murder charges, arguing joining them would deny him due process and a fair trial. He argued that while the incidents were the same class of offense, there was no cross-admissibility between them in that they had no common witnesses and had different locations and circumstances. He argued the evidence of the incidents did not demonstrate a similar motive or intent and the incidents

5

did not involve a common scheme for purposes of Evidence Code section 1101, subdivision (b). Ferncase also argued the incident involving Rayo was likely to unusually inflame the jury against him, as Rayo was elderly, working as a custodian, the assault was unprovoked, and photos showed Rayo's brain matter splattered in the parking lot. According to Ferncase, the incident with Baker in the jail cell raised legitimate issues of self-defense or imperfect self-defense, because "due to prison racial issues, [he] was forced to kill [Baker]" or else be subject to retaliation by other Hispanic inmates. Ferncase characterized both cases as weak, and argued the jury would use evidence from the first incident to find him culpable in both cases. He pointed out both charges and the special circumstance allegation made him eligible for the death penalty, even though the prosecution elected not to pursue it.

The People argued the charges were properly joined because they were offenses of the same class of crime, and connected together in their commission because the offenses shared common characteristics, that is, they had nearly identical modus operandi (punching and then stomping the victims' heads); they involved older, physically weaker victims who Ferncase described as "Mexican"; the reason Ferncase attacked each victim was his claim they called him names; Ferncase had similar intent: to "stomp [the victim] out" and kill them; and both victims sustained similar injuries in the incidents, with Ferncase merely injuring his hand. The People argued Ferncase could not establish a substantial danger of prejudice, since "(1) evidence of each incident is cross-admissible in proving the other to establish motive, intent and a common plan per Evidence Code section 1101[, subdivision] (b) . . . . Further, evidence of the crime charged in count one is cross-admissible to establish [Ferncase's] character for violence per Evidence Code section 1103[, subdivision] (b) in proving the crime charged in count two

6

assuming [Ferncase] introduces evidence of . . . Baker's character for violence . . . . (2) each charge is just as serious, violent, and graphic as the other. Both involve motionless bodies being stomped to death at least twenty-five times. The scene and injury photos from each incident are equally disturbing, neither being more inflammatory than the other. . . . (3) the strength of each case is strong and fairly equal based on the facts and [Ferncase's] admissions. The total evidence will not unfairly alter the outcome on any charges. And . . . (4) while joinder of the charges converts the matter into a potential capital case per . . . section 190.2[, subdivision] (a)(3), this is of no consequence because trying one murder charge separately after the other would still render the matter a potential capital case per . . . section 190.2[, subdivision] (a)(2)." The People pointed out they were not seeking capital punishment in any event, so that was a factor against severance.

The trial court tentatively denied Ferncase's motion, finding "a high likelihood of cross-admissibility" as both charges were "extremely serious" and the murders took place without weapons, with the victims "ultimately stomped into a coma and then into death." The court did not find one case more inflammatory than the other given the seriousness and similarities of the crimes and the way they were committed. Based on Ferncase's statements and physical autopsy evidence, the court could not say one case was necessarily weaker or stronger than the other. After considering the parties' arguments, the court confirmed its tentative, ruling the charges, both of which were "serious, violent, and graphic," were properly joined and there was cross-admissibility under Evidence Code section 1101, subdivision (b). The court ruled one case would not unfairly alter the other or prejudice Ferncase, given "the initial punching, knocking out, the stomping," the fact the murders happened three months apart in the county of San Diego, and

7

the fact each case was fairly strong based on the facts and Ferncase's admissions.

B. *Legal Principles*

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) Section 954, which governs the joinder of criminal counts, "allows for the joint trial of 'two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses.' " (*People v. Hin* (2025) 17 Cal.5th 401, 438; *People v. Lamb* (2024) 16 Cal.5th 400, 416.) "Where joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] In determining whether a court abused its discretion in declining to sever properly joined charges, we first 'consider the cross-admissibility of the evidence in hypothetical separate trials.' [Citation.] If the evidence is cross-admissible, then this 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' [Citation.] If not, then we also consider '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citation.] 'Even if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial

8

resulted in such gross unfairness as to amount to a due process violation." ' "
(*Hin,* at pp. 438-439, see also *id.* at p. 440.)

We review for abuse of discretion the court's order denying severance. (*People v. Westerfield* (2019) 6 Cal.5th 632, 689; see also *People v. Hin*, *supra*, 17 Cal.5th at p. 439; [applying abuse of discretion standard to court's "joinder ruling"]); *People v. Scott, supra*, 61 Cal.4th at pp. 395-396 [explaining when an abuse of discretion may occur in declining to sever charges].) Under that standard, Ferncase must demonstrate the denial of his motion to sever the murder charges exceeded the bounds of reason. (*Westerfield*, at p. 689.) "Where . . . the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.] A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial." (*People v. Simon* (2016) 1 Cal.5th 98, 122-123, fn. omitted; *Westerfield*, at p. 689.) We evaluate Ferncase's claims of prejudice " 'in light of the showings made and the facts known by the trial court at the time of the court's ruling.' " (*Westerfield*, at p. 689.)

C. *Analysis*

We first hold the People properly joined the murder charges because they were both offenses of the same class: murder. (§ 954; *People v. Hin*, *supra*, 17 Cal.5th at p. 438; *People v. Soper* (2009) 45 Cal.4th 759, 771 [holding "identical" charges of murder are " 'of the same class' "].) Because section 954 uses the disjunctive "or," that circumstance alone permits joinder. (*Soper*, at p. 771 ["accusatory pleading may charge two or more different offenses so long as *at least one of two conditions* is met: The offenses are (1)

9

'connected together in their commission,' *or* (2) 'of the same class' "], italics added.)

We further conclude Ferncase has not met his burden to " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Hin*, *supra*, 17 Cal.5th at p. 438.) We start with cross-admissibility of evidence on the joined charges. (*People v. Vargas* (2020) 9 Cal.5th 793, 817.) We emphasize that as to cross-admissibility, "it is sufficient that evidence supporting [one crime or set of] crimes would be admissible in a separate . . . trial [on another crime or set of crimes]. . . . ' "[T]wo-way" cross-admissibility is not required.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 38.) "[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: '*The least degree of similarity* . . . is required in order to prove intent. [Citation.] . . . In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.] By contrast, a higher degree of similarity is required to prove common design or plan . . . ." (*People v. Soper*, *supra*, 45 Cal.4th at p. 776; see *People v. Guerrero* (1976) 16 Cal.3d 719, 726 ["the standard framework for admission of evidence of other crimes is if there is no doubt that defendant has committed an act, but some question as to his intent in doing so"].)

Though Ferncase acknowledges the least degree of similarity is generally required when admitting evidence of other crimes on the issue of intent, he maintains the evidence of his offenses against Rayo and Baker is not cross-admissible because the offense against Rayo was unprovoked, whereas there was evidence Baker had provoked him. He argues the crimes

10

are therefore not sufficiently similar to support an inference he harbored the same intent. We reject the argument. In both instances, Ferncase admitted to hitting and "stomp[ing] . . . out" the individuals' in the head area once down because he perceived they were "talking shit," calling him a "white boy" or calling him names like "bitch." The offenses both had a race component, as Ferncase characterized both men as "Mexican." Ferncase agreed to the officers' statement that he had to "finish" Baker because of his race, and referred to the impact of racial differences in prison. The initiation, manner, and reasons for Ferncase's actions in both assaults are virtually identical. As stated, cross-admissibility of joined charges is normally sufficient by itself to dispel any suggestion of prejudice and to justify a court's refusal to sever properly joined charges. (*People v. Hin*, at p. 439; *People v. Scott* (2011) 52 Cal.4th 452, 470.)

Even if the crimes against Rayo and Baker were not sufficiently similar as to be cross-admissible, the remaining considerations do not demonstrate the court abused its discretion in denying severance. The absence of cross-admissibility is not dispositive. (§ 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"]; see *Alcala v. Superior Court* (2006) 43 Cal.4th 1205, 1221-1222 ["[E]ven the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance"].)

We cannot say one case is more inflammatory than the other; both involved horrific attacks and severe injuries to the victims' heads and faces, eventually resulting in their deaths. Given Ferncase's admissions to police, both cases are equally strong; we disagree Baker's murder case was weaker than Rayo's as the neighboring cellmates heard no words or argument before

11

Ferncase assaulted Baker. There is no evidence, other than Ferncase's own self-serving statements, that Baker initiated or provoked the incident. In any event, Ferncase admitted to initiating the physical altercation; Baker was only "egging [him] on . . . indirectly" by "calling him names," and then Ferncase said to Baker, "Let's box." Once Baker had fallen to the ground and was rendered unconscious, Ferncase continued the assault, admitting that he stomped Baker about 25 times, knowing during the last 10 stomps he was going to kill him.

Nor can we say Ferncase has shown that " 'events *after* the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of [his] constitutional right to fair trial or due process of law.' " (*People v. Hin*, *supra*, 17 Cal.5th at p. 440.) Whether joinder worked a gross unfairness turns upon assessing whether it was reasonably probable that the jury was influenced by the joinder in its verdict of guilt. (*People v. Vargas, supra*, 9 Cal.5th at p. 819.) This is a " 'high burden.' " (*People v. Soper*, *supra*, 45 Cal.5th at p. 783.) In *Hin*, the defendant conceded that the denial of severance of his murder and attempted murder convictions was not prejudicial in light of his admissions during an interrogation. (*Hin*, at p. 440.) In our view, Ferncase's confessions to officers immediately after the incidents eliminate the possibility that the jury could be influenced by the joinder of the two charges. And, together with Ferncase's admissions, there is "strong evidence warranting conviction . . . ." (*People v. Simon, supra*, 1 Cal.5th at p. 130.)

## II. *Introduction of Prior Misconduct*

### A. *Background*

Before trial, the court considered motions by both Ferncase and the People pertaining to prior acts involving Ferncase on the issue of motive, intent (Evid. Code, § 1101, subd. (b)) or character for violence (Evid. Code, § 1103, subd. (a)).[4] In part, the People recounted Baker's lengthy history of violent behavior and argued that in anticipation of Ferncase presenting such evidence pertaining to Baker, Ferncase's character for violence should be admitted under Evidence Code section 1103. They also argued Ferncase's prior acts were relevant to the questions of intent and motive as to the charged murders: "his act of throwing the first punch, knocking his victim to the ground, and throwing the first kick while his victim was on the ground, as [Ferncase] did in his 2014 case" showed he "derives pleasure from, and intends to, inflict pain and injure others as opposed to reserving such acts for self-defense."

---

4     "Evidence Code section 1101, subdivision (a), generally prohibits 'evidence of a person's character or a trait of his or her character' when it is 'offered to prove his or her conduct on a specified occasion.' Subdivision (b) of section 1101, however, provides: 'Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 782-783.) Evidence Code section 1103, subdivision (a) provides an exception to Evidence Code section 1101, subdivision (a) when a defendant offers evidence of the victim's character or trait " 'to prove conduct of the victim in conformity with the character or trait of character.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827.) The exception has been referred to as the "violent victim rule." (*People v. DelRio* (2020) 54 Cal.App.5th 47, citing Evid. Code, § 1103, subd. (a)(1).)

Eventually the court permitted the People to introduce evidence of four prior incidents under section 1101, subdivision (b):

· Ferncase's 2021 attempted robbery at a supermarket where Ferncase, who was taking items from the store, punched an approaching store manager in the face, then yelled, "Let's box it out," before running away.

· Ferncase's 2017 assault of his cellmate at Corcoran State Prison, in which correctional officers found the cellmate with blood on his face and Ferncase admitted that he had "got my anxiety levels up, so I beat him up."

· A 2019 assault at Mule Creek State Prison, in which Ferncase was acting erratically, then suddenly began punching an older inmate in the face and upper torso.

· Ferncase's 2022 incident with another inmate at the Vista Detention Facility, where a corrections officer found both inmates with their shirts off in a fighting stance.

The court further allowed the People under Evidence Code section 1103, subdivision (b) to introduce those four incidents on Ferncase's character for violence in addition to two other incidents:

· A 2011 assault described by a witness as occurring after a yelling and screaming match among three individuals at a park, during which Ferncase, who was one of the individuals, "just whaled off and punched [a girl] straight in the face, like closed fist," causing her to fall back on the ground.

· A 2014 assault that Ferncase committed by means of force likely to produce great bodily injury and personally inflicted great bodily injury causing the victim to become comatose.

14

B. *Contentions*

Ferncase contends the court prejudicially erred by admitting the above-mentioned prior acts into evidence; that evidence of the 2017, 2019, 2021 and 2022 incidents should have been excluded in whole or part under Evidence Code section 1101, subdivision (b) because they were too dissimilar to the charged offenses, and lacked sufficient probative value to justify their admission. He further contends the court erred by allowing into evidence all six past incidents under Evidence Code section 1103, subdivision (b), because the prior acts "did not necessarily speak to a character trait for violence."[5] Ferncase maintains the court should have excluded in whole or part the evidence under Evidence Code section 352[6] on grounds the evidence's "minimally probative value" was outweighed by its prejudicial impact.

C. *Admission of the Prior Acts, Even if Error, Was Harmless*

We need not decide whether the trial court erred by permitting the People to introduce evidence of Ferncase's past assaults and other misconduct, because even if we were to assume error, it is harmless under the appropriate prejudice standard. Error, if any, in admitting evidence of Ferncase's prior acts under Evidence Code sections 1101 and 1103 is subject to the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818

---

[5]     Though the court initially ruled the 2022 Vista prison assault was inadmissible on the issue of Ferncase's character for violence, it ultimately allowed the jury to consider it on that issue as well as under Evidence Code section 1101, subdivision (b).

[6]     Evidence Code section 352 gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

(*Watson*). (See *People v. Johnson* (2022) 12 Cal.5th 544, 611 [admission of prior crimes under Evidence Code section 1101]; *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 827 [exclusion of Evidence Code section 1103 evidence]; *People v. Marks* (2003) 31 Cal.4th 197, 227 ["application of ordinary rules of evidence . . . does not implicate the federal Constitution"]; *People v. Megown* (2018) 28 Cal.App.5th 157, 167 [prior acts of domestic violence admitted under Evidence Code section 1101].) Under the *Watson* test, we examine whether Ferncase has shown it is " 'reasonably probable that a result more favorable to [him] would have been reached in the absence of the error.' " (*Johnson*, at p. 611; see *Megown*, at p. 167; *Watson*, at p. 836.)

Here, Ferncase admitted to repeatedly stomping on the victims' heads, acknowledging that he had killed Rayo, and had either killed or paralyzed Baker. He admits Rayo's killing was essentially unprovoked, a reaction only to Rayo assertedly calling Ferncase a "white boy." Given Ferncase's admissions, there is little uncertainty about what happened at the respective scenes. (Compare, *People v. DelRio*, *supra*, 54 Cal.App.5th at p. 54 [finding prejudice in a case where the "factual context [was] one of uncertainty" including about what happened at the scene of a gunfight and whether the defendant or victim first raised a gun, making the violent victim evidence highly probative].) As for the crimes against Baker, even assuming the jury found credible Ferncase's assertion that Baker "started" the fight, his own admissions show Baker was not "violently aggressive [so as to] force[ ] [Ferncase] to resort to deadly self-defense." (*Ibid*.) That is, Baker used only words, calling Ferncase names, and Ferncase admitted to initiating the physical altercation by throwing the first punch. Indeed, the responding detective on the scene confirmed that Ferncase told him he (Ferncase) "threw the only punches." Further, Baker was unconscious by the time Ferncase

16

began stomping his head and did not pose any threat so as to support any claim Ferncase acted in self-defense, reasonable or otherwise. There were no independent witnesses to support a conclusion that Ferncase acted in self-defense. Nor did the physical evidence independently establish as much. (Compare, *DelRio,* at p. 57 [exclusion of evidence of victim's violent character in a murder case was not harmless where the case was "close," an eyewitness "testified to classic self-defense," the defendant's version of events was compatible with all physical evidence, and no evidence suggested the defendant had a motive to shoot the victim, his cousin].) Indeed, the witness and physical evidence contradicted Ferncase's version, as neither neighboring cellmate heard words exchanged between Baker and Ferncase, and Ferncase sustained few injuries. Regardless of evidence that Baker was "ill-tempered" or had a history of violence against other inmates, the trial evidence of Baker's murder overwhelmingly suggests Baker was not the initial aggressor, but the victim.

Ferncase maintains the prior bad act evidence (Evid. Code, § 1101, subd. (b)) was "precisely the type of evidence likely to evoke an emotional bias against appellant and inflame the passions of the jury." But the prior crimes evidence (as well as the two additional incidents admitted under Evidence Code section 1103) did not come close to being as inflammatory and horrific as the facts and circumstances of Rayo's and Baker's murders. And contrary to Ferncase's argument that the evidence was unduly time consuming, it did not take up a significant part of the People's case. (Accord, *People v. Johnson, supra,* 12 Cal.5th at p. 611 [court assumed without deciding error occurred and found no prejudice in part because prior crimes evidence was not a significant part of the prosecution's case].) The trial was lengthy; the record reflects approximately 10 days of trial witness testimony and stipulations.

17

Though the prosecutor at trial played video of two of the prior act incidents, one (the Vista Detention Facility assault) was three minutes and 57 seconds long; the other (supermarket incident) was 11 seconds. The prosecutor's summary of the incidents in opening statements took about one of eight pages in the transcript, and approximately five and a half pages of a 52-page closing argument. And the court instructed the jury with CALCRIM No. 375 to "not consider the evidence for any other purpose except for the limited purpose of determining the defendant's character trait for violence . . . ." (Accord, *Johnson*, at p. 612.) It instructed the jury as to the acts admitted under Evidence Code section 1103 that it may "consider that evidence for the limited purpose of deciding whether the defendant is a violent person and acted in conformity with that character trait." " 'We must assume, contrary to defendant's theory of prejudice, that the jury obeyed the express language of the instruction not to use the other-crimes evidence to establish defendant's character or his disposition to commit crimes.' " (*Ibid*.) The foregoing reasons compel us to hold that any assumed error in admitting the evidence under Evidence Code section 352 was likewise harmless.

Based on the foregoing, we hold there is no reasonable probability Ferncase would have achieved a more favorable outcome at trial if the Evidence Code section 1101 and 1103 evidence had been excluded. (*Watson, supra*, 46 Cal.2d at p. 837.)

18

### III.  *Parole Revocation Restitution Fine*

The trial court imposed on Ferncase a $300 parole revocation fine under section 1202.45.[7]  Citing *People v. Montes* (2021) 70 Cal.App.5th 35, Ferncase contends the parole revocation fine should be stricken because he was sentenced to life without the possibility of parole for both murders.  The People respond that Ferncase received a determinate sentence in addition to life without the possibility of parole, triggering imposition of the parole revocation fine.  In reply, Ferncase says his two consecutive life-without-the-possibility-of-parole sentences "compel a finding that 'there can be no parole' in this matter."

The People are correct that the fine is mandated because Ferncase's sentence also includes a determinate term.  The California Supreme Court has repeatedly held that such a term "*includes a parole period 'by law* and carrie[s] with it, also by law, a suspended parole revocation restitution fine.' "  (*People v. Alvarez* (2025) 18 Cal.5th 387, 484, quoting *People v. Brasure* (2008) 42 Cal.4th 1037, 1075; see also *People v. Baker* (2021) 10 Cal.5th 1044, 1108-1109.)  The matter is unlike that of the defendant in *People v. Montes*, *supra*, 70 Cal.App.5th 35, who was sentenced to life without the possibility of parole.  (*Montes*, at p. 38.)  In *Brasure*, the "defendant . . . , in addition to his death sentence, was sentenced to a determinate prison term . . . ."  (*Brasure*, at p. 1075.)  On a challenge to imposition of the parole revocation fine in that case, the California Supreme Court explained:  "[Former] Section 3000,

---

7       Section 1202.45 provides:  "In every case where a person is convicted of a crime *and his or her sentence includes a period of parole*, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (§ 1202.45, subd. (a), emphasis added.)

19

subdivision (a)(1) provides that [a determinate term imposed under section 1170] 'shall include a period of parole.' Section 1202.45, in turn, requires assessment of a parole revocation restitution fine '[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole.' The fine was therefore required . . . . [¶] . . . [D]efendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine. Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Ibid.*; see also *People v. Alvarez*, at p. 484 [emphasizing distinction between indeterminate and determinate terms, and quoting *Brasure*].) Because Ferncase was also sentenced to a determinate prison term for the murders, the parole revocation fine was properly assessed.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

BUCHANAN, J.

KELETY, J.

20